UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Erwin Lawary,                                          Case No. 04-1668 DWF/FLN

                        Plaintiff,

vs.                                                     **REPORT AND**
                                                        **RECOMMENDATION**

Jo Anne B. Barnhart,
Commissioner of
Social Security,

                        Defendant.
_____

Daniel S. Rethmeier, Esq., for Plaintiff.
Lonnie F. Bryan, Esq., for the Government.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on the

parties' cross-motions for summary judgment [##16 and 20]. Plaintiff Erwin Lawary ("Mr. Lawary"

or "Plaintiff") seeks judicial review of the Commissioner of Social Security's final decision denying

him Disability Insurance Benefits ("DIB"). See 42 U.S.C. §§ 416(i), 1381a, 1382c. The Court has

jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons which

follow, the Court recommends that Plaintiff's Motion be denied and Defendant's Motion be granted.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits under the Social Security Act

on March 13, 2001. (Tr. 53-55.) He alleged disability commencing on January 1, 2001. (Tr. 71.)

Plaintiff's application was denied initially and on reconsideration. (Tr. 208-10.) Plaintiff requested

a hearing before an Administrative Law Judge ("ALJ"). (Tr. 41-42.) A hearing was held before

1

Administrative Law Judge Paul D. Tierney on July 17, 2002. (Tr. 274-313.) The ALJ issued a decision unfavorable to Plaintiff on November 2, 2002. (Tr. 28.) Plaintiff appealed the decision to the Appeals Council. (Tr. 13-14.) After an extension of time for Plaintiff to submit additional evidence, the Appeals Council declined to review the ALJ's decision on February 25, 2004.[1] (Tr. 8-12.) The denial of review made the ALJ's findings the final decision of the defendant. 42 U.S.C. §405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981.

## II.  FACTS

### A.      Background and Plaintiff's Testimony

Plaintiff appeared and testified at the hearing, accompanied by his attorney. (Tr. 274.) Mr. Lawary was born on January 23, 1957, and was forty-five years old when the ALJ issued his decision denying disability benefits. (Tr. 28, 53, 278.) Mr. Lawary testified that he had undergone alcohol treatment in 1996 and that he continued to attend AA meetings. (Tr. 284.) Plaintiff stated that the last time he had anything to drink was in 1998, when he had two beers. (Tr. 284, 290.) Mr. Lawary testified that he did not drive and that he had lost his driver's license. (Tr. 279.)

Mr. Lawary received a generic equivalency degree ("GED") in the U.S. Army. (Tr. 280.) He was discharged in 1985. (Tr. 280.) While in the Army, Mr. Lawary was a quartermaster equipment repairer, which involved "repairing generators, and engines, and army tanks[.]" (Tr. 280.) Mr. Lawary testified that the job involved "a lot of heavy lifting[,]" and that he injured his back while in the Army. (Tr. 280.) Mr. Lawary testified that he has never been married. (Tr. 279.)

---

[1] The Appeals Council noted that it had considered the additional evidence submitted, but found that the information did not provide a basis for changing the Administrative Law Judge's decision. (Tr. 8-9.)

At the time of the hearing he had twin six-year old sons who lived with him.  (Tr. 279.)  Mr. Lawary's sole source of income is Veteran's Administration disability of $699.00 per month.  (Tr. 287.)

The mother of Mr. Lawary's children was incarcerated at the time of his alleged onset of disability, and Plaintiff had custody of the children who were four.  (Tr. 156.)  Plaintiff testified that the mother of his children had been arrested and his children had been taken to foster care.  (Tr. 296.)  After finding out, Plaintiff obtained an attorney and received custody of his children.  (Tr. 296.)  At the hearing, Mr. Lawary stated that the mother of his children was out of jail and that she was able to see the boys whenever she wanted.  (Tr. 296.)  He also testified that the younger of the twins was diagnosed with ADHD, and that he wrote notes to the boy's teacher regarding medications.  (Tr. 288-89, 296.)

Mr. Lawary last worked at Servicemaster, which involved tasks such as emptying trash cans and wiping off desktops, in January of 2001, leaving the job due to an aggravation in his back.  (Tr. 281, 292.)  Plaintiff testified that he informed his supervisor that his back was acting up and that his supervisor told him to go home for the day.  (Tr. 281.)  According to Plaintiff, his supervisor called him the next day and told Plaintiff "he didn't need me no more."  (Tr. 281.)  Prior to that, he worked at Fingerhut, where his duties involved inspecting items that came down a conveyor belt, bagging the items and sending them on.  (Tr. 292.)  Mr. Lawary testified that the job required him to lift over 50 pounds, which would bother his back.  (Tr. 293, 303, 305.)  He stated that he informed his supervisor that his back bothered him, but that his supervisor was unsympathetic.  (Tr. 293, 303, 305-06.)  Plaintiff stated that he would walk off the job and go home early due to his back problems.

(Tr. 303.)   Plaintiff testified that he was discharged from the Fingerhut job after telling his supervisor that his "back had went [sic] out" and he was sent home.  (Tr. 293, 307.)

Mr. Lawary testified that he experienced pain in his back along with spasms and pinching and "pounding."  (Tr. 285, 297-98.)  Plaintiff stated that his pain was a nine on a scale of ten at its worst, and was a seven on average.  (Tr. 300.)  He also testified that he experienced numbness in his left leg and sometimes his left foot, and weakness on his right side in the hip.  (Tr. 299.)  Mr. Lawary testified that due to his back pain, he was unable to lift over 20 pounds, and that he could only sit or stand for approximately 20 minutes at a time.  (Tr. 285.)  Plaintiff stated that four days a week, he needed to lay down for 30 minutes to relieve his discomfort.  (Tr. 285.)  Mr. Lawary testified that bending, strain and movement bothered his back.  (Tr. 297, 301.)

Plaintiff testified that he suffered from depression and anxiety, and that he tried to stay in the house most of the time because he did not like being around crowds of people or talking to people.  (Tr. 302.)  Plaintiff stated that he had good days and bad days, with his bad days being very depressing.  (Tr. 304.)  Plaintiff testified that on bad days he did not want to do anything and that he sometimes he would not leave his apartment.  (Tr. 304.)  He stated that such days occurred about twice a week.  (Tr. 305.)  Plaintiff also testified that the thought of his mother's murder made him feel worse.  (Tr. 302.)  Plaintiff testified that she was murdered while he was in the Army.  (Tr. 302.)

Mr. Lawary testified that he was responsible for taking care of his children as well as the household chores, cooking and grocery shopping.  (Tr. 286.)  Plaintiff testified that he paid his own bills and kept his checkbook.  (Tr. 288.)  Mr. Lawary testified that his girlfriend, who lived in the apartment next door, assisted him with household chores and otherwise, and that she helped him with bathing, personal grooming, dressing and exercising.  (Tr. 287, 296-98.)  Plaintiff stated that

4

he would play games such as Monopoly with his children, and that he took them to the park where they could run and he could walk around a track. (Tr. 301, 304.) Plaintiff stated that his doctor had told him that it was good to walk. (Tr. 301.) Plaintiff stated that he sometimes played cards with his girlfriend and that he read the Bible. (Tr. 287, 289.) Mr. Lawary testified that he also read the sports section of the newspaper and that he would watch the Minnesota Twins on television whenever he had a chance. (Tr. 288, 287-88.)

**B.    Medical Evidence**

The medical records in evidence detail treatment Mr. Lawary received through the Department of Veteran Affairs. On November 30, 1999, Plaintiff saw Dr. Eduardo P. DeSanto ("Dr. DeSanto"), for an assessment of his "mental status because he ha[d] written a bad check and also had sustained a driving while intoxicated charge last Memorial Day for drinking." (Tr. 166.) Mr. Lawary reported to Dr. DeSanto that his depression was better. (Tr. 166.) Dr. DeSanto noted that Plaintiff was working at Fingerhut and that he did some lifting of boxes not over 50 pounds. (Tr. 166.) Plaintiff asked for a refill of Tylenol with Codeine, but Dr. DeSanto instead prescribed plain Tylenol. (Tr. 166.) Dr. DeSanto noted that if Plaintiff developed a "flare of his back pain" that he would be reassessed. (Tr. 166.)

Plaintiff saw Dr. Gemma Guzman ("Dr. Guzman"), on January 5, 2000, at the direction of his probation officer for an evaluation for mental illness and drugs. (Tr. 164.) Mr. Lawary reported sleeping only four hours a night, a lack of appetite and a lack of energy. (Tr. 164.) Dr. Guzman noted that she had seen Plaintiff in 1997 through an alcohol treatment program. (Tr. 164.) Dr. Guzman noted that Plaintiff had been placed on house arrest for bad check and for a driving while intoxicated charge from the previous year. (Tr. 164.) Plaintiff denied using any drugs or alcohol

recently. (Tr. 164.) Mr. Lawary reported sometimes hearing music, but denied hearing voices. (Tr. 164.) Dr. Guzman observed that Plaintiff was calm, alert, fully oriented , coherent and relevant. (Tr. 164.) Dr. Guzman diagnosed Plaintiff with dysthymic disorder, and alcohol and drug dependency, in remission. (Tr. 164.) Dr. Guzman noted that Plaintiff's drug dependency was in remission for several years, and that his alcohol remission was in remission since May of 1999. (Tr. 164.) Dr. Guzman noted that Plaintiff would be started on medication to aid his sleep, and that he would be seen again in three months. (Tr. 165.)

On June 5, 2000, Plaintiff returned to Dr. DeSanto, requesting renewal of his medication for backaches, specifically "something stronger." (Tr. 163.) Dr. DeSanto observed that Mr. Lawary had some low back paraspinal spasm bilaterally, but that straight-leg raise testing seemed satisfactory. (Tr. 163.) Plaintiff's lumbar spine range of motion was satisfactory in all directions. (Tr. 163.) Dr. DeSanto agreed to restart Plaintiff on Tylenol with Codeine. (Tr. 163.)

On November 22, 2000, Plaintiff returned to Dr. DeSanto, complaining of pinching pains in his upper, mid and lower back. (Tr. 162.) Plaintiff reported that he had been working at a foundry factory in St. Cloud lifting core molds of cast iron, but that he had lost his job in August. (Tr. 162.) Dr. DeSanto noted that Plaintiff had chronic low back pain since being injured in the Army, and that he was "40% service connected." (Tr. 162.) Dr. DeSanto noted that past x-rays of Mr. Lawary's lumbar spine were negative, x-rays of his cervical spine revealed degenerative changes pronounced at C5-6, and x-rays of his lumbosacral spine were normal. (Tr. 162.) On physical examination Plaintiff exhibited local tenderness in his low back but no paraspinal spasms. (Tr. 162.) Straight-leg raising caused tightness at 45 degrees bilaterally, but his lumbar range of motion was fairly well in all aspects and directions. (Tr. 162.)

6

On November 28, 2000, Plaintiff called requesting an early refill of his Tylenol with Codeine. (Tr. 161.) Dr. Barbara F. Olson ("Dr. Olson"), reviewed Plaintiff's request and decided not to refill his prescription early. (Tr. 161.) On January 17, 2001, a brief note indicates that Mr. Lawary reported his pain as an 8 on a scale of 10. (Tr. 160.)

Plaintiff saw Dr. Olson on April 4, 2001, complaining of "back pain, which has caused him to lose all the jobs that he has had recently." (Tr. 159.) Mr. Lawary reported feeling depressed lately and Dr. Olson noted that he had an appointment with the mental health clinic. (Tr. 159.) Dr. Olson suggested to Plaintiff that he seek vocational rehabilitation and that he should seek physical therapy. (Tr. 159.)

On April 6, 2001, Mr. Lawary saw Clinical Nurse Specialist Carol Eversman ("CNS Eversman"), for management of his medication. (Tr. 156-57.) CNS Eversman noted that Plaintiff's affect was flat and that he spoke with a monotone voice. (Tr. 156.) Plaintiff reported that he heard voices that told him to kill himself, but that he was in control of his behavior and would notify someone if he felt that he was losing control. (Tr. 156.) Plaintiff reported that he had attempted suicide in 1985 by jumping off of a building but that he had been "talked down" by a friend. (Tr. 156.) CNS Eversman noted Plaintiff's substance abuse history and his legal troubles. (Tr. 157.) CNS Eversman assessed Mr. Lawary with anxiety and depression, noting that he was not suicidal and that sleep seemed to be his biggest problem. (Tr. 157.) CNS Eversman rated him at a moderate level of depression on the Beck Depression Inventory. (Tr. 157.) CNS Eversman increased the dosage of his sleep medication and encouraged Plaintiff to go to bed at a regular and routine time. (Tr. 157.)

The record contains a Department of Veteran Affairs ("DVA") rating decision dated May

14, 2001.  (Tr. 190-91.)  Mr. Lawary was continued at a 40 percent disabled rating for his chronic

low back pain and sciatica.  (Tr. 190.)  Mr. Lawary was also given a 10 percent disabled rating for

sensory neuropathy in his left lower leg.  (Tr. 190.)  The decision noted that a recent examination

showed that Plaintiff continued "to have a sever low back disability with chronic pain, and limitation

of motion and function of the lower spine."  (Tr. 190.)  The decision also noted that Plaintiff had

marked limitation in forward bending and loss of lateral motion with osteoarthritic changes.  (Tr.

190.)

On June 1, 2001, Mr . Lawary failed to attend a follow-up appointment for medication

management.  (Tr. 155.)  On June 27, 2001, he called complaining of trouble holding his head up

due to dizziness.  (Tr. 155.)  Plaintiff also requested a new prescription for Tylenol with Codeine

which was approved.  (Tr. 155.)

On June 30, 2001, Dr. Marlon P. Rimando ("Dr. Rimando"), a state agency physician,

reviewed the physical medical evidence.  (Tr. 122-29.)  Based on the record, Dr. Rimando opined

that Mr. Lawary could perform a range of light work including lifting 20 pounds occasionally, 10

pounds frequently, and sitting, standing or walking for up to 6 hours in an 8-hours day with

occasional stooping and no concentrated exposure to hazards. (Tr. 123-24, 126.)  Dr. Rimando

deemed Plaintiff's severity of symptoms as partially credible based on limited examination findings.

(Tr. 127.)  Dr. Dan Larson, also a state agency physician, reviewed the record in January of 2002,

and concurred with the conclusions of Dr. Rimando.  (Tr. 129.)

On July 17, 2001, Mr. Lawary saw Dr. James H. Dobis ("Dr. Dobis"), as a walk-in.  (Tr.

154.)  Dr. Dobis noted that Plaintiff was "a little more tender in the lumbar area of the back

bilaterally, maybe a little more tender in the left lumbar area that the right."  (Tr. 154.)  Straight-leg

8

raising was normal, but with some increased back pain when his legs were raised beyond 70 degrees. (Tr. 154.)  Dr. Dobis also noted that Mr. Lawary had good muscle reflexes, no muscle wasting and that there was no clinical evidence for a herniated disc in his back.  (Tr. 154.)  Dr. Dobis refilled Plaintiff's Tylenol with Codeine prescription.  (Tr. 154.)

On August 6, 2001, a state agency psychologist review of the mental medical record indicated a diagnosis of affective disorder with symptoms of decreased energy, feelings of guilt or worthlessness and difficulty concentrating or thinking.  (Tr. 132, 135.)  Plaintiff was determined to have mild restriction in his activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. 142.)  A subsequent review of the record by another state agency psychologist on January 19, 2002, concurred with the conclusions.  (Tr. 132, 173-81.)

On September 25, 2001, Plaintiff returned to Dr. Olson, complaining of low back pain and depression and anxiety.  (Tr. 150.)  Dr. Olson noted that Plaintiff had not kept a vocational rehabilitation appointment.  (Tr. 150.)  Dr. Olson also noted that Plaintiff had been seen in the Mental Health Clinic earlier in the day, and had been given a prescription for his depression and anxiety. (Tr. 148, 150.) Mr. Lawary requested a letter from Dr. Olson stating that he could not work in order for him to qualify for food stamps.  (Tr. 150.)  Dr. Olson wrote a letter indicating that he could not work, but included that he would be attending vocational rehabilitation within 30 days. (Tr. 150.) Following his Mental Health Clinic appointment, CNS Eversman noted that Plaintiff had reported continuing to hear voices telling "him to go to the bridge."  (Tr. 148.)  CNS Eversman noted that Plaintiff's mood problem continued, that he was not motivated to change any of his activity, and that he had psychotic experiences.  (Tr. 148.)

On October 4, 2001, Plaintiff was evaluated by Jon R. Standahl, Ph.D., L.P. ("Dr. Standahl"), on behalf of the state agency. (Tr. 182-88.) Mr. Lawary reported that his problems were depression and anxiety and that he also had back problems  (Tr. 183.)  Dr. Standahl noted that Plaintiff presented with a flat affect and that he spoke with a monotone. (Tr. 183.)  Plaintiff reported that "his problems began in 1994 after a jealous boyfriend murdered his mother."  (Tr. 183.)  Plaintiff indicated that 1994 was when his condition was diagnosed.  (Tr. 183.)  Plaintiff also reported that he felt that his medication never really helped his condition.  (Tr. 183.)  Plaintiff stated that he heard voices that tell him to kill himself and described the suicide attempt when he was talked down from jumping off a building in 1985.  (Tr. 184.)  Plaintiff stated that he watched television three to four hours per day, that he liked to watch movies and that he listened to music.  (Tr. 184.)  Plaintiff stated that he took his kids to the park once a month.  (Tr. 184.)  Plaintiff reported going to bed at 10:00 p.m., but not falling asleep for approximately four hours, and then rising at 4:00 or 5:00 a.m.  (Tr. 184.)  Plaintiff claimed to have no real friends.  (Tr. 184.)

On observation, Dr. Standahl observed that Mr. Lawary appeared to be tense, as if he were in pain. (Tr. 185.)  Plaintiff's speech was inhibited and vague, but relevant and coherent.  (Tr. 185.) Plaintiff's affect was restricted, and Dr. Standahl noted that Plaintiff felt hopeless, that he cried frequently and that isolated himself.  (Tr. 185.)  Dr. Standahl observed that he was in contact with reality, and that he was oriented to time, place and person.  (Tr. 185.)  Plaintiff reported that he had not used drugs or alcohol since 1995.  (Tr. 185.)  Plaintiff was able to do serial sevens and could repeat back four but not five digits forward. (Tr. 186.)  Plaintiff was unable to mentally subtract or divide simple numbers, and Dr. Standahl noted his suspicion of malingering.  (Tr. 186.)  Plaintiff was able to remember two out of three items immediately but could not get any of them with delays

or recognition, and Dr. Standahl again suspected malingering.  (Tr. 186.)  Plaintiff kept up with current sports information.  (Tr. 186.)  When asked what he would do in a movie theater if he saw smoke and fire, Mr. Lawary responded that he would finish watching the movie, prompting Dr. Standahl to again suspect malingering. (Tr. 186.) Dr. Standahl noted that Plaintiff seemed "to have insight into his mental problems, if in fact he has them."  (Tr. 186.)  Dr. Standahl estimated Plaintiff's intellect in the borderline range.  (Tr. 186.)

Dr. Standahl noted Plaintiff's conviction for writing bad checks and opined that he might have a personality disorder.  (Tr. 187.)  Dr. Standahl diagnosed Plaintiff with Major Depressive Disorder, Chronic with Psychotic Features; Malingering; and Polysubstance Dependence (claimed to be in remission).  (Tr. 187-88.)  Dr. Standahl assigned a GAF score of 45.[2]  (Tr. 188.)  Dr. Standahl, however, stated that he was not confident in his diagnosis, noting that Plaintiff's claims about substance use were suspect, and that the fact that Plaintiff had only attempted suicide once was inconsistent with his reports of constantly hearing voices telling him to kill himself.  (Tr. 187.)  Dr. Standahl also observed that given Plaintiff's results on memory testing, it was hard to see how he could take care of his children or have a relationship with his girlfriend.  (Tr. 187.)  Dr. Standahl stated that if Mr. Lawary's statements were to be believed he could not tolerate the stress and pressure found in an entry level workplace.  (Tr. 188.)

On January 17, 2002, Chiropractor Randal J. Jacklitch ("Dr. Jacklitch"), addressed a letter

---

[2] The Global Assessment of Functioning scale is used to assess an individual's overall level of functioning.  Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision)).  The lower the score, the more serious the individual's symptoms.  See id.  A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV 34.

to the state agency regarding his treatment of Mr. Lawary. (Tr. 189.) Dr. Jacklitch noted that he had

started treatment of Plaintiff on August 3, 2001, with a diagnosis of lumbosacral sprain/strain,

lumbosacral dysfunction, sacroiliac sprain/strain and sciatica. (Tr. 189.) Plaintiff responded slowly

to treatment at first, but by September 26, 2001, Plaintiff had showed improvement with less pain

intensity and a frequency. (Tr. 189.) Mr. Lawary's last appointment with Dr. Jacklitch was on

November 9, 2001, and Dr. Jacklitch noted that Plaintiff was feeling much better and was placed on

a two week interval for treatment. (Tr. 189.) Plaintiff did not show up to his next appointment, and

when reached by phone, he indicated that he would call for an appointment if one was needed. (Tr.

189.)

**C.    Vocational Expert's Testimony**

Wayne Onken ("Mr. Onken" or "VE") testified as a vocational expert at the hearing. (Tr.

308-12.) The ALJ asked Mr. Onken to assume that Plaintiff was able to lift 20 pounds occasionally,

10 pounds frequently; could stand, walk, or sit a total of six hours each in an eight-hour day; would

have a sit/stand option; was limited to simple work; and limited to brief and superficial contact with

co-employees and supervisors. (Tr. 309.) When asked if Plaintiff could perform any of his past

work, Mr. Onken testified that he could not because his "past work was all at heavier levels than

that." (Tr. 309.) The ALJ then asked whether Mr. Lawary was capable of performing other jobs

in the regional or national economy. (Tr. 309-10.) The VE testified that there were approximately

2,000 cashier II positions; 2,000 assembler of small products positions; and 1,500 bench assembler

positions in the State of Minnesota. (Tr. 310.)

Plaintiff's attorney asked Mr. Onken if he had reduced the cashier position to take into

account Plaintiff's limitations on pace and performance. (Tr. 310-11.) The VE responded that he

had, and that without taking such limitations into account there would be approximately 50,000 such jobs available in Minnesota.  (Tr. 311.)  Plaintiff's attorney then asked Mr. Onken whether an individual who was absent up to two times per week would be employable, to which the VE testified that such an individual would be precluded from competitive employment.  (Tr. 311.)  The VE also testified that generally not more than two absences per month was acceptable.  (Tr. 311-12.)

**D.      The ALJ's Decision**

In evaluating Plaintiff's claim of disability, the ALJ followed the five-step sequential process outlined at 20 C.F.R. § 416.920.  (Tr. 19.)  At the first step in the process, the ALJ evaluated whether the Plaintiff engaged in substantial gainful activity since the date of alleged onset of disability and concluded that Mr. Lawary had not engaged in substantial gainful activity after the alleged onset date.  (Tr. 19.)

At the second step in the sequential evaluation, the ALJ determined whether or not the Plaintiff had a "severe" impairment, which is defined as an impairment which imposes more than a minimal effect on Mr. Lawary's physical or mental ability to perform basic work-related activities. 20 C.F.R. § 416.921.  (Tr. 19.)  The ALJ found that Mr. Lawary has severe impairments of degenerative disc disease of the low lumbar spine and an affective disorder of depression as well as a history of cocaine and alcohol abuse in claimed remission.  (Tr. 20.)  After finding that Mr. Lawary's impairments were "severe," the ALJ turned to step three to determine whether his impairments met, medically equaled, or were functionally equivalent to any impairments contained in the Listing of Impairments, Appendix 1 to Subpart P, Regulations No. 4.  20 C.F.R. § 1520(d); (Tr. 21.)

The ALJ evaluated Plaintiff's physical impairments of his back under the criteria set forth

at Section 1.04 of the Listings, which requires:

> A.    Evidence of nerve root compression characterized by neuro-anatomic distributions of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dyesthesia, resulting in the need for changes in position or posture more than once every two hours;
> or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively[.]

Id., § 1.04; (Tr. 21.)  The ALJ found that there was no evidence in the record indicating nerve root compression, spinal stenosis or other neural compromise and concluded that Plaintiff's physical impairments did not meet or equal the relevant criteria.  (Tr. 21, 23.)

The ALJ next considered Mr. Lawary's mental impairments.  (Tr. 21-22.)  Specifically, the ALJ noted a substance abuse addiction disorder un Section 12.09 and considered whether the medical evidence supported a finding of impairment under the "A" and "B," or "C" criteria of the listing for Affective Disorder § 12.04.  20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04.  The ALJ apparently assumed that Plaintiff met the "A" criteria for a Section 12.04 Listing, and  proceeded to analyze the "B" criteria, which require at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence or pace; or 4) repeated episodes of decompensation.  Id., § 12.04B; (Tr. 21.).

The ALJ found that Mr. Lawary suffered mild impairments in his activities of daily living,

moderate limitations in his social functioning, mild to moderate limitations in his ability to maintain concentration, persistence or pace, and no episodes of decompensation. (Tr. 21-22.) The ALJ thus concluded that Mr. Lawary did not meet the "B" criteria. (Tr. 22.) The ALJ likewise found no presence of the "C" criteria,[3] noting that Plaintiff continued to live independently and has not required psychiatric hospitalization. (Tr. 22.)

The ALJ thus turned to the fourth step, determining Mr. Lawary's residual functional capacity ("RFC") and whether it allowed him to perform any of his past relevant work. 20 C.F.R. § 416.920(e); (Tr. 22-26.). The ALJ considered the medical record and Mr. Lawary's subjective complaints of disability. (Tr. 22-26.) The ALJ assessed his subjective complaints according to the factors laid out in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984); (Tr. 23.) The ALJ concluded that the objective medical record did not support Plaintiff's subjective complaints. (Tr. 23-24.) The ALJ also found that Plaintiff's subjective complaints of disability were not entirely credible based on inconsistencies in the record and possible motivation for secondary gain. (Tr. 24.) The ALJ adopted the analyses of the state agency physicians regarding Plaintiff's physical limitations, and found that the evaluation of Dr. Standahl undercut Plaintiff's complaints of disability. (Tr. 24.) The ALJ determined that Mr. Lawary's activities of daily living and his medication usage were not consistent with the degree of impairment alleged. (Tr. 25.) The ALJ noted that he had considered the opinion of Dr. Olson, but found that it appeared to be based solely on the assertion of Mr.

---

[3] The "C" criteria require a medically documented history of a chronic mental disorder of at least two years duration, causing more than a minimal limitation in ability to do basic work activity, symptoms or signs currently attenuated by medication of psychosocial support, and repeated episodes of decompensation or a marginal adjustment such that even a minimal increase in mental demands would cause decompensation, or a history of one or more years inability to function outside a highly supportive living arrangement along with continued need for such an arrangement. 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04C.

Lawary and not supported by physical examination findings.  (Tr. 26.)

The ALJ concluded that Mr. Lawary retained the RFC for light exertional work.  (Tr. 23.) The ALJ found that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, and could sit, stand , and walk for six of eight hours, along with a sit/stand option.  (Tr. 23.)  The ALJ limited Plaintiff to simple, repetitive work involving only brief and superficial contact with others.  (Tr. 23.) Based on the VE's testimony, the ALJ found that Mr. Lawary was unable to return to his past relevant work.  (Tr. 26.)

The ALJ thus turned to the fifth step, at which the burden shifts to the Commissioner to prove that a claimant is capable of adjusting to other work.  (Tr. 26.)  Finding the VE credible and persuasive, the ALJ found that Plaintiff was capable of performing other jobs such as cashier II, small product assembler and bench assembler.  (Tr. 27.)  Therefore, the ALJ concluded that Mr. Lawary did not meet the relevant statutory criteria for a finding of disability.  (Tr. 27.)

**E.     Evidence Submitted to the Appeals Council**

Following the decision of the ALJ, Plaintiff submitted additional evidence to the Appeals Council, which consisted largely continued DVA treatment notes and an additional rating decision. (Tr. 212-73.)  On September 5, 2002, Plaintiff saw Psychiatrist Keith L. Brown ("Dr. Brown").  (Tr. 222.)  Dr. Brown noted that Plaintiff had no problems at the time.  (Tr. 222.)  At a follow-up visit on December 23, 2002, Dr. Brown again noted no mental difficulties or problems.  (Tr. 214.)  Dr. Brown, however, cut the interview short because Mr. Lawary was in pain.  (Tr. 214.)

On July 19, 2002, Plaintiff saw Dr. Phuc Nguyen ("Dr. Nguyen"), for complaints of back pain.  (Tr. 223.)  Mr. Lawary reported that he could not walk and that it was hard for him to standup from a sitting position. (Tr. 223.)  Dr. Nguyen observed a limited range of motion in Plaintiff's back

and assessed him with chronic pain syndrome.  (Tr. 223.)  On October 24, 2002, Plaintiff saw Dr.

Nguyen, for a flare up of his back pain.  (Tr. 217.)  Mr. Lawary rated his pain at an eight on a scale

of ten. (Tr. 217.)  Dr. Nguyen noted that Plaintiff's x-ray in 1996 was normal, but decided to obtain

updated x-rays.  (Tr. 217.)  X-rays taken that same day were normal.  (Tr. 224.)  On January 7, 2003,

Mr. Lawary asked Dr. Nguyen to write him an assessment indicating that he did not need to work.

(Tr. 212.)  Dr. Nguyen noted that physical examination of Plaintiff's back revealed no acute signs,

and that there were no clinical findings to suggest an acute condition.  (Tr. 212.)

On March 7, 2003, Dr. Olson indicated that Plaintiff was unable to engage in employment

indefinitely.  (Tr. 261A.)  Dr. Olson based her note on Plaintiff's low back pain with numbness in

his left leg.  (Tr. 261A.)  On March 13, 2003, Dr. Olson noted that Plaintiff had chronic low back

pain and referred him to Rehabilitation for a functional capacity evaluation.  (Tr. 256.)  On April 7,

2003, the functional capacity evaluation was cancelled after Plaintiff reported a left shoulder injury

after he was doing pushups and situps.  (Tr. 254.)  Plaintiff was instructed to reschedule the

evaluation.  (Tr. 254.)  On May 29, 2003, Mr. Lawary again cancelled a functional capacity

evaluation, claiming that he could not find a ride.  (Tr. 252.)  After consultation with Dr. Olson, the

referral for evaluation was discontinued.  (Tr. 252.)

X-rays of Mr. Lawary's lumbar spine, taken on June 2, 2003, were normal.  (Tr. 231.)  It was

noted that they were unchanged since October 24, 2002. (Tr. 231.)  On June 21, 2003, Mr. Lawary

presented to Dr. Olson with a fractured hand, and she gave him a note indicating that he could not

work for 60 days.  (Tr. 250-51.)  Dr. Olson noted that Plaintiff had missed three scheduled functional

capacity evaluations.  (Tr. 250.)

On August 29, 2003, Plaintiff returned to Dr. Brown.  (Tr. 248.)  Mr. Lawary stated that he

17

had bouts of depression and nightmares and that he had witnessed traumatic events.  (Tr. 248.)

Plaintiff informed Dr. Brown, that he had witnessed his mother being killed.  (Tr. 248.)  Dr. Brown

noted no evidence of mania, delirium, dementia or anything else suggesting Plaintiff needed to be

in a psychiatric hospital.  (Tr. 248.)

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of

whether the Secretary's findings are supported by substantial evidence.  See Gavin v. Heckler, 811

F.2d 1195, 1197-99 (8th Cir. 1987); Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986).

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.  See Richardson v. Perales, 402 U.S. 389, 401 (1971); 42 U.S.C. § 405(g).

The Eighth Circuit has expanded upon this substantial evidence standard, holding that the

Commissioner's decision must be based upon substantial evidence on the record as a whole.  See

Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989).  This expanded standard requires the court

to do more than search for the existence of substantial evidence which supports the Commissioner's

findings.  Id. at 175.  The substantiality of the evidence must take into account whatever is in the

record that fairly detracts from its weight.  See Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989)

(citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).  However, the Court "may

not reverse merely because substantial evidence would have supported an opposite decision."

Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996) (internal citations omitted).  The Court is

required to review the administrative record as a whole and to consider:

1.      The credibility findings made by the ALJ;

2.      The education, background, work history, and age of the plaintiff;

3.      The medical evidence provided by treating and consulting physicians;

4.      The plaintiff's subjective complaints and descriptions of pain, impairment, and physical activity;

5.      Any corroboration of plaintiff's impairments by third parties; and

6.      The testimony of vocational experts based upon proper hypothetical questions setting forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

## IV.  ISSUES ON APPEAL

1.      Did the ALJ evaluate the medical evidence of record properly?

2.      Did the ALJ improperly discount Mr. Lawary's subjective complaints of disability?

3.      Did the ALJ err by positing to the Vocational Expert an incomplete hypothetical?

## V.  CONCLUSIONS OF LAW

In moving for summary judgment, Plaintiff alleges that: (1) the ALJ and the Appeals Council failed to properly evaluate the medical evidence by failing to credit the medical evidence showing that Plaintiff suffered from disabling limitations; (2) the ALJ and the Appeals Council erred in evaluating Plaintiff's subjective complaints; and (3) the ALJ erred by finding Plaintiff not disabled because the hypothetical posited to Mr. Onken was invalid and incomplete due to the ALJ's failure to include the full range of Plaintiff's limitations.

Defendant contends that:  (1) the ALJ properly evaluated the medical evidence and accorded proper weight to the various medical opinions in the record; (2) the ALJ's credibility finding supported by substantial evidence in the record; (3) the ALJ propounded a well supported

hypothetical to the VE, and adopted the VE's testimony that a person with Plaintiff's limitations could perform a significant number of other jobs; and (4) the evidence submitted after the ALJ's decision would not have altered the ALJ's decision.

## A.    The ALJ's Evaluation of the Medical Evidence

A treating physician's opinion is entitled to great weight if it is well supported by medically acceptable techniques and is not inconsistent with the other substantial evidence in the record. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).   The treating physician's opinion should not ordinarily be disregarded.   Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991). The ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence or if the treating physician has offered an inconsistent opinion.   Hogan, 239 F.3d at 961.    A consulting physician's opinion generally does not constitute substantial evidence when the physician has examined the claimant only once, or not at all.   Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998); Shontos v. Barnhart, 322 F.3d 532, 540-41 (8th Cir. 2003).

The opinion of a treating physician must be afforded substantial weight.   Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998).   Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.   Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995). An ALJ may discount a treating physician's medical opinion when the treating source's statements are conclusory or unsupported by medically acceptable clinical or diagnostic data. Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

When weighing a medical opinion, the ALJ should consider: 1) the examining relationship;

2) the treatment relationship; 3) whether medical findings support the opinion; 4) whether the

opinion is consistent with the record as a whole; and 5) whether the physician is a specialist.  20

C.F.R. § 404.1527(d)(1)-(5); Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003).  It is not,

however, the law in the Eighth Circuit that the ALJ must consider each factor in deciding how much

weight to accord a medical opinion, but rather the ALJ "should 'give good reasons' for discounting

a treating physician's opinion."  Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2003) (quoting

Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000), reh'g and reh'g en banc denied, April 26,

2000); cf. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to

methodically discuss each Polaski consideration, so long as he acknowledged and examined those

considerations).

Plaintiff contends that the ALJ and the Appeals Council failed to properly evaluate the

medical evidence, primarily by failing to credit the DVA doctors' opinions that Plaintiff was limited

to no work or part-time work.  Significantly, the bulk of Plaintiff's argument goes to the evidence

submitted after the ALJ rendered his decision, such as Dr. Olson's note of March 7, 2003, indicating

that Plaintiff was unable to work indefinitely.  (Tr. 261A.)  The Court will discuss the evidence

submitted after the decision below under the appropriate standard for such submissions.  Plaintiff

fails to direct the Court to any specific medical evidence in the record, which was available to the

ALJ, which would support Plaintiff's claims of disability.  Plaintiff's argument instead resolves to

the conclusory assertion that, "The subjective findings of Mr. Lawary are documented by objective

findings in the course of treatment . . . from November 1999 to September 2001 (Tr. 212-223, 231-

63, 292-96)."  Mem. in Support, p. 12-13.

The Court cannot agree with Plaintiff's contention that the ALJ improperly evaluated the

medical evidence in this matter.   The ALJ specifically addressed the pertinent treatment notes of
Dr. Olson, Dr. DeSanto, Dr. Dobis and CNS Eversman noting that the objective medical testing was
normal.  (Tr. 20-24.)  The ALJ acknowledged that on April 4, 2001, Dr. Olson opined that Plaintiff
was unable to work due to his low back pain.  (Tr. 20, 26.)  The ALJ found, however, that Dr.
Olson's opinion appeared to be based solely on Plaintiff's subjective complaints and not supported
by any objective physical examination.  (Tr. 26.)  Plaintiff does not address the ALJ's rationale in
this respect, and the Court's review of the record has turned up nothing to cast doubt on the ALJ's
evaluation of Dr. Olson's opinion of April 4, 2001.  Instead, a review of the record indicates that Dr.
Olson's opinions and assessment appear to be based on nothing more than Plaintiff's subjective
complaints.  (Tr. 11, 148, 150-51, 159.) As such, her opinion simply cannot be given controlling
weight.  20 C.F.R. § 404.1527(d)(3).

Plaintiff also takes issue with the ALJ's finding that Dr. Standahl's evaluation cast doubt on
Plaintiff's credibility.  Plaintiff argues that the ALJ erred by characterizing Dr. Standahl evaluation
as diagnosing Plaintiff as malingering, noting that Dr. Standahl stated a lack of confidence in his
diagnosis.  The Court notes that the ALJ did not find that Dr. Standahl had diagnosed Plaintiff with
malingering, but instead, the ALJ noted that Dr. Standahl had documented "significant discrepancies
in the claimant's concentration, memory, and judgment findings which would suggest malingering."
(Tr. 24.)  The ALJ found that Dr. Standahl's findings were not fully consistent with Plaintiff's
subjective complaints.  (Tr. 24.)  Moreover, the Court is of the opinion that Dr. Standahl was
expressing his doubts as to his diagnosis that Plaintiff had a chronic major depressive disorder,
rather than the possibility that Plaintiff was malingering.  In other words, Dr. Standahl's diagnosis
was that Plaintiff suffered from a depressive disorder, but Dr. Standahl expressed his doubts about

his diagnosis based on inconsistencies in Plaintiff's evaluation. (Tr. 186-88.)

Plaintiff does not direct the Court to any other evidence available to the ALJ which would cast doubt on the ALJ's evaluation of the medical evidence. The Court concludes that the ALJ thoroughly analyzed the medical evidence in the record and gave good reasons in according and balancing weight. 20 C.F.R. § 404.1527; Dolph, 308 F.3d at 878-79.

**B.      The ALJ Evaluation of Plaintiff's Subjective Complaints**

In the Eighth Circuit, subjective complaints of pain are evaluated in accordance with the requirements of Polaski, 739 F.2d at 1322. The claimant need not produce direct medical evidence of the cause and effect relationship between the impairment and the degree of the claimants' subjective complaints. Id. Thus, the ALJ must consider all of the evidence relating to subjective complaints, including Plaintiff's prior work record; observations by third parties and physicians; Plaintiff's daily activities; duration, frequency and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. Id. Failure to give some consideration to a claimant's subjective complaints is an error. Brand, 623 F.2d at 526. "[A] headache, back ache, or sprain may constitute a disabling impairment even though it may not be corroborated by an x-ray or some other objective finding." Id. An ALJ must consider a claimant's subjective complaints regardless of whether they are corroborated by objective medical findings. Id.

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), judgment vacated on other grounds sub nom. Bowen v. Polaski, 476 U.S. 1167 (1986). The Polaski factors require the ALJ to give full consideration to all the evidence presented relating

to subjective complaints, including prior work record, and observations of third parties and treating/examining physicians relating to such matters as:

    A.     the claimant's daily activities;

    B.     the duration, frequency, and intensity of the pain;

    C.     precipitating and aggravating factors;

    D.     dosage, effectiveness, and side effects of medication; and

    E.     functional restrictions.

Id.

If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony." Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations." Id. "The ALJ may discount a claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). On the other hand, the ALJ may not disregard a claimant's subjective complaints solely because he or she believes the objective medical evidence does not support them. Griffon v. Bowen, 856 F.2d 1150, 1154 (8th Cir. 1988).

Plaintiff contends that the ALJ and the Appeals Council failed to properly consider his subjective complaints of disability. Plaintiff first argues that the ALJ improperly concluded that Plaintiff's complaints were not supported by objective medical evidence including imaging studies. Plaintiff, however, does not direct the Court to any imaging studies in the record, or any other

objective medical evidence which would support his complaints of disability.  As discussed above, the ALJ's evaluation of the medical evidence of record is supported by substantial evidence. Moreover, the imaging studies in the record, including those submitted to the Appeals Council, of Plaintiff's low back revealed normal results.  (Tr.  162, 224, 231.)

Plaintiff also contends that the ALJ erred in drawing adverse inferences from the fact that the ALJ noted that Plaintiff's subjective complaints may have been motivated at times by secondary gain, and Plaintiff's pattern of treatment and his daily activities.  The Court notes that Plaintiff's argument regarding the ALJ's findings regarding his pattern of treatment and daily activities is simply the conclusory assertion that "Plaintiff's pattern of treatment and his activities are fully consistent with Plaintiff's alleged mental and physical impairments."  Mem. in Support, p. 18. Plaintiff fails to direct the Court to any evidence which would contradict the ALJ's opinion, and a review of the record reveals no such evidence.  As such, Plaintiff's argument is simply without merit.

The ALJ found that secondary gain was evident in Plaintiff's request to Dr. Olson for a letter stating he could not work because he needed food stamps.  (Tr. 25, 150.)  Rather than impugning Plaintiff for availing himself of the Veteran's disability program, as Plaintiff contends, the ALJ's conclusion casts doubt on the reliability of Dr. Olson's note, and Plaintiff's subjective complaints, especially because there is no objective medical evidence to support such complaints.

The Court cannot agree with Plaintiff's contention that the ALJ improperly discredited Plaintiff's credibility with respect to his subjective complaints of disability.  The ALJ undertook an exhaustive examination of the Polaski factors.  (Tr. 22-26.)  The ALJ specifically noted inconsistencies with claims of total disability in Plaintiff's daily activities, his testimony regarding

past alcohol use, his use of medications and their side-effects, his inconsistent employment history and motivation for work, and the potential motivation for secondary gain. (Tr. 22-26.) The ALJ specifically looked at the record and weighed the consistency of Plaintiff's complaints. As discussed above, Plaintiff fails to direct the Court to any specific evidence contradicting the ALJ's findings. The Court concludes that the ALJ's findings are well supported, and that the ALJ engaged in a balanced consideration of Plaintiff's subjective complaints.

## C.     The Hypothetical Questions Posed to the VE

"Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence." Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996). While a hypothetical must accurately set forth all of the claimant's impairments, the question need only include those limitations accepted by the ALJ as true. Rappaport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991).

Plaintiff contends that the ALJ propounded an invalid and incomplete hypothetical that was flawed by his improper evaluation of the medical evidence and Plaintiff's subjective complaints of disability. Specifically, Plaintiff contends that the hypothetical did not contain the full range of impairments set forth in the record. The Court notes that Plaintiff inquired of the VE whether an additional limitation of more than two unscheduled absences a month would affect the hypothetical individual's employability, to which the VE stated it would preclude such an individual from engaging in competitive employment. (Tr. 311-12.)

Based on the conclusions above, that the ALJ engaged in a proper evaluation of the medical evidence and of Plaintiff's credibility, the Court disagrees with Plaintiff's contention. The ALJ formulated a proper RFC, based on substantial medical evidence, taking into account Plaintiff's subjective complaints, and presented it in a proper form to the VE. The ALJ was within his purview

to reject Plaintiff's proposed additional limitation.  <u>Rappaport</u>, 942 F.2d at 1323.

**D.    The Post-Hearing Evidence**

A plaintiff is permitted to submit additional evidence, if the evidence is new and material.

20 C.F.R. § 404.970(b); <u>Browning v. Sullivan</u> 958 F.2d 817, 822 (8th Cir. 1992).  A plaintiff must

also demonstrate good cause for failing to incorporate the material in the proceedings before the

ALJ.  <u>See Woolf</u>, 3 F.3d at 1215.   The Court's role in such situations is to determine whether the

ALJ's decision is supported by the record as a whole, including the evidence submitted after the

determination was made.  <u>See</u> <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1069 (8th Cir. 2000).  Such a role

is peculiar on review, and requires the Court to consider how the ALJ would have weighed the new

evidence had it existed at the hearing. <u>See</u> <u>id.</u>; <u>Riley v. Shalala</u>, 18 F.3d 619, 622 (8th Cir. 1994).

Plaintiff submitted additional records of ongoing treatment at the DVA to the Appeals

Council.  Plaintiff argues that these records, along with the records available to the ALJ reveal "a

course of treatment . . . together with a compensation and pension evaluation supporting a Veteran

Affair's determination of unemployability [which] is entitled to weight from the ALJ." <u>Mem. in</u>

<u>Support</u>, p. 14.   As Plaintiff notes, however, a disability determination by the Veteran's

Administration is not binding on an ALJ considering an SSI or DIB claim.  <u>Fisher v. Shalala</u>, 41

F.3d 1261, 1262 (8th Cir. 1994).  Instead, the ALJ must make a determination based on the law and

regulations governing such claims.  20 C.F.R. § 404.1504 (stating that a disability determination

must be made based on social security law).  Thus the precise issue related to the records submitted

to the Appeals Council is whether it is likely that the ALJ would have changed his decision if they

had been available.

The Court is of the opinion that rather than change the ALJ's opinion, the records submitted

to the Appeals Council would likely have bolstered his conclusions.  X-rays taken in 2002 and 2003 revealed that Plaintiff's lower back was normal, bolstering the ALJ's finding that Plaintiff's subjective complaints were unsupported by relevant imaging studies.  (Tr. 20, 224, 231.)  The records reveal no significant increase in symptoms or frequency of treatment, and Dr. Brown's treatment notes indicate that Plaintiff's mental health may have in fact improved.  (Tr. 214, 222, 250-52.)  Moreover, the record indicates that Plaintiff consistently failed to attend a functional capacity evaluation.  (Tr. 252, 254, 256.)  Based on the evidence submitted to the Appeals Council, the Court simply cannot conclude that the ALJ would have decided this matter in any other way. The record in its entirety shows that the ultimate finding of the ALJ, that Plaintiff is not disabled because he retains the RFC to perform other jobs existing in substantial number in the regional or national economy, is supported by substantial evidence on the record as a whole.  See Wilson, 886 F.2d at 175.

## VI.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment [#16] be **DENIED**;

2. Defendant's Motion for Summary Judgment [#20] be **GRANTED**.


DATED: August 15, 2005                    s/ Franklin L. Noel
                                          FRANKLIN L. NOEL
                                          United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before September 1, 2005, any written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.